**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **RICKY TERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:05-CV-00256** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Ricky Terry appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying Terry's application under the

Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits

("DIB").[1] (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will

be AFFIRMED.

### I.  PROCEDURAL HISTORY

Terry applied for DIB on August 7, 2003, alleging that he became disabled as of June 15,

2003. (Tr. 57-59.)  The Commissioner denied his application initially and upon reconsideration,

and Terry requested an administrative hearing. (Tr. 36, 40-49.)  On October 12, 2004,

Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Terry, who

was represented by counsel, and a vocational expert testified. (Tr. 271-91.)  On March 17, 2005,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

the ALJ rendered an unfavorable decision to Terry, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 14-24.)  The Appeals Council denied Terry's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-13.)

Accordingly, Terry filed a complaint with this Court on July 27, 2005, seeking relief from the Commissioner's final decision. (Docket # 1.)  This appeal became ripe for the Court's review as of March 27, 2006. (*See* Docket # 12-16.)

## II.  THE PARTIES' POSITIONS

Terry points to four alleged errors in the Commissioner's final decision.  First, Terry claims that the ALJ improperly evaluated the opinion of Dr. Manu Patel, his treating family practitioner, and the opinion of Dr. Kevin Murphy, his treating psychiatrist. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") at 11-14.)  Next, Terry asserts that the ALJ improperly discredited his testimony concerning his symptoms and debilitating limitations. (*Id.*)  Finally, Terry contends that the ALJ erred at step five by failing to properly articulate his residual functional capacity ("RFC") when posing the hypotheticals to the vocational expert. (*Id*. at 16-17.)

The Commissioner, however, argues that substantial evidence supports the decision to deny Terry a period of disability.  First, the Commissioner argues that the ALJ's assessment of Terry's RFC was supported by substantial evidence, properly discounting the opinions of Dr. Patel and Dr. Murphy. (Mem. in Supp. of the Commissioner's Decision at 12-14.)  Next, the Commissioner contends that the ALJ correctly determined that Terry's complaints of disabling pain were not fully credible, finding they were inconsistent with other substantial evidence in the

record. (*Id*.)  Finally, the Commissioner asserts that the ALJ did not commit an error at step five

that necessitates a remand, as the third hypothetical posed by the ALJ to the vocational expert

properly encompassed Terry's limitations. (*Id*. at 16.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).  The

ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227

F.3d 863, 869 (7th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Id.*  The decision will be reversed only if it is not supported

by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record, but does not

reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment

for the Commissioner's. *Id.*  Nonetheless, "substantial evidence" review should not be a simple

rubber-stamp of the Commissioner's decision. *Id.*

### IV.  THE LAW

To be considered disabled under the Act, a claimant must establish that he is "[unable] to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A).  The impairment must be severe,

causing the claimant to be unable to do his previous work, or any other substantial gainful

activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[2] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).   An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## V.  APPLICATION AND ANALYSIS

### A.  __The Facts__[3]

#### *1. Background*

At the time of the hearing, Terry was forty-four years old, had a high school education,

---

[2] Before performing steps four and five, the ALJ must determine the claimant's RFC, that is, what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

[3] The administrative record in this case is voluminous (291 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

and possessed approximately fifteen years of work experience as a blast operator in a foundry. (Tr. 57, 66-67, 73, 274-75.)  In his work as a blast operator, Terry picked up parts weighing between fifteen and one hundred pounds and loaded them into a "shot blast machine" for cleaning. (Tr. 66, 275.)  Terry left his job on June 14, 2003, because it "was ag[g]ravating the pain in [his] back, hips and legs." (Tr. 66.)  Terry alleges he became disabled as of June 15, 2003, due to degenerative disc disease, schizophrenia, and hypertension. (Tr. 65-66.)

At the hearing, Terry stated that he lives alone (with his dog) in a house owned by his father, who has been paying all of the bills since Terry stopped working. (Tr. 280-81.)  He reported that he spends his days cleaning the house, taking out the garbage, watching television, and going out to eat. (Tr. 279.)  He explained that he is independent with self care and driving, but that his stepmother helps with housework and his brother mows his lawn. (Tr. 279, 281-82.)  He testified that he has no hobbies and does not participate in social activities, other than visiting with his relatives. (Tr. 278-79.)  Terry also stated that he has a fifteen-year-old son, but that his aunt has custody of him. (Tr. 280.)

From a physical capacity standpoint, Terry, who was five feet eleven inches tall and weighed 252 pounds at the time of the hearing, testified that he can stand for only fifteen to twenty minutes at a time due to his back pain. (Tr. 275.)  He reported that he "can't even walk around the block" because of pain in his right hip and stated that he can lift less than ten pounds. (Tr. 275, 279.)  He explained that he can sit for fifteen to twenty minutes at a time, but then needs to change his position. (Tr. 278.)  Terry stated that he uses Tylenol to relieve his pain, particularly after walking around the block, sitting too long in one position, or lifting more than ten pounds. (Tr. 278-79.)

In addition to his physical limitations, Terry provided the following testimony regarding his mental status:

Q       Do you have any other medical problems that affect your ability to work?
A       Well, I see a psychiatrist.  So, I'm at the time getting really, you know, real nervous, and he diagnosed me schizophrenic.

Q       How does that affect your ability to work?
A       More or less I think it keeps me from doing a good job.

Q       What do you mean by that?
A       From doing the job the way it's supposed to be and that.

Q       When you - - do you have any difficultly concentrating?
A       Yes, I do.

Q       Could you be more specific?
A       Well, . . . more or less sometimes I hear voices and hallucinations.

Q       Do you have any difficulty dealing with stress?
A       Yes, I do.

Q       Can you give any examples of that?
A       More or less - - well, the only thing I can think of is I get real nervous and that, and I, you know, I try to keep up, you know, with production and that.

Q       Do you have any difficulty getting along with people?
A       No, I don't.

(Tr. 277.)  Terry further explained that he takes medication for his schizophrenia, although he failed to take it as prescribed on at least one occasion when he inadvertently ran out of it. (Tr. 278.)

Despite Terry's testimony on October 12, 2004, describing his mental limitations, Terry and his father informed the Field Office in September 2003 that Terry filed for DIB for physical reasons only and that his schizoaffective disorder is currently stable and has been so for a long

time.[4] (Tr. 91-92.)  Accordingly, he declined to undergo a consultative psychological examination at that time. (Tr. 91-92.)

### 2. Relevant Medical History

Fort Wayne Orthopaedics

On July 7, 2003, approximately three weeks after his alleged disability onset date, Terry was evaluated by Dr. Michael Arata, an orthopaedic surgeon, due to a one-month history of back and groin discomfort. (Tr. 183.)  Terry explained to Dr. Arata that his condition causes him to limp and that his symptoms are aggravated by sitting, standing, walking, and driving, but are alleviated by lying supine. (Tr. 183.)  On physical examination, Dr. Arata observed that Terry had markedly limited motion when attempting to rotate his right hip, but rotation of his left hip was full and painless. (Tr. 183.)  An X-ray of Terry's lumbar spine showed calcification along the anterior longitudinal ligament from at least T10 through L1, with some other bridging osteophytes forming in the lower lumbar region. (Tr. 184.)  An X-ray of Terry's pelvis demonstrated obliteration of the sacroiliac joints, but the right hip was obscured. (Tr. 184.)  Dr. Arata assigned a diagnosis of ankylosing spondylitis and probable osteoarthritis of the right hip, and ordered a CBC, sedimentation rate, and an HLA-B27 antigen, together with a lateral X-ray of the right hip and X-rays of the thoracic spine.[5] (Tr. 184.)

On July 28, 2003, Terry saw Dr. Arata for a follow-up visit. (Tr. 181.)  Dr. Arata reported

_____

[4] While Terry refers to having "schizophrenia," the record points more particularly to "schizoaffective disorder," which is a disorder characterized by a mixture of symptoms suggestive of both schizophrenia and an affective disorder. *Stedman's Medical Dictionary* 1,389 (William R. Hensyl, ed., 25th ed. 1990).

[5] "Ankylosing Spondylitis" is defined as "arthritis of the spine, resembling rheumatoid arthritis, that may progress to bony ankylosis with lipping of vertebral margins." *Stedman's Medical Dictionary* 1,456 (William R. Hensyl, ed., 25th ed. 1990).

7

that Terry's pelvic X-ray demonstrated severe osteoarthritis of the right hip and that his spinal X-ray showed widespread calcification along the anterior longitudinal ligament throughout the thoracic spine and hip or lumbar spine. (Tr. 181.)  He informed Terry that the X-ray finding in combination with obliteration of the sacroiliac joints was strong evidence of ankylosing spondylitis. (Tr. 181.)  However, he further commented that Terry's laboratory studies were normal and that his HLA-B27 test, which is positive in ninety percent of individuals with ankylosing spondylitis, was negative. (Tr. 181.)  Dr. Arata concluded that Terry had "significant spinal and hip problems" and ordered an MRI scan of his lumbar spine. (Tr. 181.)

On August 4, 2003, Dr. Arata reviewed with Terry the MRI scan of his lumbar spine; he explained that the MRI showed a large disc protrusion at L5-S1 on the left side, correlating with his radicular-like pain in his left leg. (Tr. 176.)  Dr. Arata summarized that "Terry has a number of orthopedic problems," including osteoarthritis of the right hip, herniated disc at L5-S1 on the left, and probable ankylosing spondylitis. (Tr. 176.)  He recommended that Terry undergo a selective nerve root block at L5-S1 on the left side, which he received eight days later. (Tr. 172, 176.)

On September 8, 2003, Terry returned to Dr. Arata, reporting that although the nerve block was initially effective, his symptoms returned after about ten days. (Tr. 169.)  On physical examination, Dr. Arata noted a positive straight leg raise on the left side, but no gross neurological deficits. (Tr. 169.)  He advised Terry that, since he had been symptomatic for four months, he might want to consider a laminotomy/discectomy. (Tr. 169.)  He further opined that Terry had underlying ankylosing spondylitis, but that Terry was "not all that symptomatic from his arthritic right hip" and that the immediate plan (that is, the laminotomy/discectomy) related

8

to the sciatica in his left leg. (Tr. 169.)

On September 16, 2003, Terry received another lumbosacral transforaminal epidural injection. (Tr. 166.)

On October 23, 2003, Dr. Arata completed a Restriction Worksheet, placing Terry off work "indefinitely." (Tr. 246.)

On December 1, 2003, Terry visited Dr. Arata, reporting that his back symptoms were a bit better. (Tr. 244.)  Terry stated to Dr. Arata that he "can live with the problem currently as it is" and reported that his back problem had largely subsided. (Tr. 244.)  On physical examination, Terry's straight leg raise test was negative bilaterally with a normal neurovascular exam in the lower extremities. (Tr. 244.)  Dr. Arata opined that Terry should "treat his various orthopaedic problems conservatively for as long as possible[,] but eventually . . . he may need to consider surgery[,] most likely hip arthroplasty." (Tr. 244.)  Dr. Arata further stated that he believed Terry "has some genually [sic] disabling problems" and that he would "be happy to help out in any way that [he] can." (Tr. 244.)

On January 14, 2004, Dr. Arata again completed a Restriction Worksheet, placing Terry "off work indefinitely pending disability." (Tr. 243.)

On January 26, 2004, Terry returned to Dr. Arata, again complaining of low back pain. (Tr. 241.)  Upon examination, Dr. Arata noted that Terry still had stiffness in his right hip due to arthritis, but that his neurovascular exam in the lower extremities was normal. (Tr. 241.)  Dr. Arata recommended that Terry continue with conservative treatment, including physical therapy. (Tr. 241.)

On March 1, 2004, Terry visited Dr. Arata, seeking a referral for additional physical

therapy visits, as he thought the physical therapy was helping him. (Tr. 239.)  Dr. Arata authorized additional physical therapy visits, but also encouraged Terry to start on a home exercise program. (Tr. 239.)

On April 5, 2004, Terry returned to Dr. Arata for a follow up visit, reporting that he had been discharged from physical therapy and that his back was "about the same." (Tr. 237.)  Dr. Arata advised Terry to continue with conservative treatment, but that he ultimately would need to consider a total hip arthroplasty of the right hip. (Tr. 237.)  However, he emphasized that Terry's back problem should be treated non-surgically. (Tr. 237.)

### Dr. Manu P. Patel

Terry periodically visited Dr. Manu Patel, his family practitioner, during the relevant time period for complaints such as back pain, cough, sore throat, and medication refills. (Tr. 151-62.)  On October 6, 2004, Dr. Patel provided a Medical Source Statement, in which he opined that Terry could lift and/or carry less than ten pounds frequently; could stand and/or walk less than two hours in an eight-hour workday; must alternately sit and stand to relieve pain or discomfort; is limited in pushing and/or pulling with his upper and lower extremities; could only occasionally climb, balance, kneel, crouch, crawl, and stoop; is limited in reaching, handling, fingering, and feeling; had limited vision; and possessed environmental limitations pertaining to temperature extremes, noise, dust, vibration, humidity/wetness, hazards, and fumes/odors/chemicals/gases. (Tr. 259-62.)

### Parkview Behavioral Health

The record reflects that Terry has a history of treatment for a schizoaffective disorder dating back to 1994. (Tr. 138-50.)  Terry visited Dr. Kevin Murphy, a psychiatrist at Parkview

Behavioral Health, approximately twice a year, and Dr. Murphy monitored Terry's medications. (Tr. 128-37.)  In 2001 and 2002, Dr. Murphy frequently observed that Terry was disheveled and/or unshaven and that he was working long hours, but concluded that he was stable and "doing okay." (Tr. 131-35.)

In July 2003, Terry complained to Dr. Murphy that his mood was "not very good" and that his employer might close the business; Dr. Murphy recommended no change in Terry's medication. (Tr. 130.)  About one week later, Terry called Dr. Murphy, reporting that he had an anxiety attack with chest pain and had not returned to work since the attack. (Tr. 129.)  He denied having any additional anxiety attacks and having any stressors, but upon further questioning articulated his concern that his employer might shut down. (Tr. 129.)  He also reported that he had been "bumped off" his job and that he was doing a job that he did not like when the anxiety attack occurred. (Tr. 129.)  Dr. Murphy placed Terry on Ativan. (Tr. 129.)

On September 30, 2003, Terry returned to Dr. Murphy for a check-up, reporting that his mood was good, he was sleeping fine, and that he noted no depression or anxiety. (Tr. 270.)  Terry shared with Dr. Murphy that he had filed for disability. (Tr. 270.)  Dr. Murphy recommended that Terry's medication regime be maintained. (Tr. 270.)

On March 30, 2004, Terry reported to Dr. Murphy that he was doing "ok" and had no hallucinations, though he experienced occasional anxiety. (Tr. 268.)  Dr. Murphy observed that Terry was unshaven and soft spoken and that he had gained weight, which Terry explained was due to a decrease in physical activity. (Tr. 268.)

On September 14, 2004, Terry told Dr. Murphy that he was "not too good" and that he had not slept in the past week, reporting that he had lost ten pounds. (Tr. 267.)  Dr. Murphy

observed that Terry was disheveled and unshaven, and that he was slurring his speech. (Tr. 267.)

Dr. Murphy concluded that Terry's schizophrenia was exacerbated by his multiple medical

problems and because he had been off his medications. (Tr. 267.)

On October 5, 2004, Dr. Murphy completed a Medical Source Statement on Terry's

behalf, opining that Terry had moderate impairment in his ability to understand, remember, and

carry out instructions; moderate impairment in his ability to make judgments on simple work-

related decisions; moderate impairment in his ability to interact appropriately with the public,

supervisors, and co-workers; marked impairment in his ability to respond appropriately to work

pressures in a usual work setting; and marked impairment in his ability to respond appropriately

to changes in a routine work setting. (Tr. 265-66.)  Dr. Murphy further opined that Terry

appeared to be experiencing increased negative symptoms of schizophrenia complicated by

persisting pain and possible medication side affects. (Tr. 265-66.)  He also observed that Terry

had decreased self-care, poor hygiene, and often presented as disheveled and unshaven. (Tr.

266.)

### Dr. Michael E. Holton

On October 20, 2003, Terry saw Dr. Michael Holton for a disability evaluation. (Tr. 202-

04.)  He reported to Dr. Holton that he could sit for thirty minutes without changing position,

stand about fifteen minutes at one time, walk approximately one block at a leisurely pace, walk

up one to two flights of steps without significant discomfort, and that he is unable to lift over ten

pounds without discomfort. (Tr. 202-04.)

On physical examination, Dr. Holton observed that Terry had apparent increased low

back discomfort when rising from a chair and getting on/off the examination table, but that he

had normal gait and station. (Tr. 202-03.)  Dr. Holton further noted that Terry had no perceived difficulty walking on heels, toes, or tandem walking, except for bilateral lower extremity stiffness, but that Terry had palpable tenderness of the lumbar paravertebrals and increased low back discomfort with heel walking. (Tr. 203.)  Dr. Holton further observed that Terry had moderate to marked generalized stiffness of the affected areas, especially the right hip, but normal strength and muscle tone in all four extremities. (Tr. 203-04.)  A straight leg raising test was positive on the left and negative on the right. (Tr. 204.)  He assigned Terry a diagnosis of chronic low back pain with radicular features, history of schizoaffective disorder, hypertension, and possible degenerative joint disease of the right hip. (Tr. 204.)

### Dr. R. Fife

Dr. R. Fife reviewed Terry's medical record on behalf of the state agency and provided a Physical Residual Functional Capacity Assessment. (Tr. 206-13.)  He concluded that Terry could occasionally lift and/or carry up to twenty pounds; could frequently lift and/or carry up to ten pounds; could stand and/or walk for at least two hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; had a limited ability to push and/or pull in the lower extremities; could occasionally climb, balance, stoop, kneel, and crawl; should never crouch; must avoid concentrated exposure to extreme cold, extreme heat, wetness, and vibration; and must avoid even moderate exposure to hazards including machinery and heights. (Tr. 206-13.)  Dr. Fife's opinion was affirmed by Dr. R. Wenzler, another state agency physician, one month later. (Tr. 213.)

### W. Shipley, Ph.D.

On November 16, 2003, W. Shipley, Ph.D., reviewed Terry's medical record on behalf of

13

the state agency and concluded that his schizoaffective disorder was not a severe mental

impairment, finding that he experienced only mild functional limitations. (Tr. 214-27.)  He noted

that Terry had a history of a schizophrenic disorder that was stable and that Terry reported his

limitations arose solely from his physical problems, refusing to undergo a psychological

evaluation during the DIB application process. (Tr. 226.)  One month later, R. Klion, Ph.D.,

another state agency psychologist, affirmed Dr. Shipley's opinion. (Tr. 214.)

### 3.  Summary of Vocational Expert Testimony

Vocational expert Leonard Fisher, Ph.D., testified at the hearing. (Tr. 271, 283-90.)  The

ALJ posed a sequence of hypotheticals, set forth *infra*, to Dr. Fisher, asking that he "consider

only the limitations that [he] placed[d] in the hypothetical when responding." (Tr. 284.)

> Q    Assume an individual the same age, education, and work background as [Terry]
> limited to light work with no climbing ropes, ladders, and scaffolds, no crouching,
> limited in the lower extremities meaning no repetitive or frequent operation of
> foot controls, avoid concentrated exposure to extreme cold, extreme heat, and
> wetness.  Also avoid concentrated exposure to fumes, odors, dust, gas, gases, and
> poor ventilation.  No work around unprotected heights, limited to simple routine
> repetitive task[s].  No production rate pace work but rather goal-oriented work,
> and can be around employees throughout the workday, but only occasional
> conversations and interpersonal interaction.  With those limitations would there
> by any types of work that would be available to such a hypothetical [c]laimant?

(Tr. 284.)  In response, Dr. Fisher opined that such an individual could perform jobs as a wire

worker (350 available jobs), wire machine tender (300 to 400 available jobs), mail sorter (150

available jobs), and tube assembler (225 available jobs), which are all classified as unskilled

light work. (Tr. 284-85.)

The ALJ then posed a second hypothetical to Dr. Fisher, which was the "same as

hypothetical number one, but . . . add[ing] a stand/sit option at the employee's will." (Tr. 286.)

Dr. Fisher responded that such an individual could perform work as a mail sorter (150 available

jobs), tube assembler (225 available jobs), and office helper (425 available jobs). (Tr. 285-86.)

Next, the ALJ posed a third hypothetical to Dr. Fisher, which was the "[s]ame as hypothetical number one" except with the individual being limited to sedentary work. (Tr. 287.) Dr. Fisher responded that such an individual could perform work as a surveillance system security monitor (300 available jobs), film touch-up inspector (200 available jobs), document preparer microfilming (200 to 300 available jobs), and circuit layout (200 to 300 available jobs). (Tr. 287.)

Finally, Terry's attorney posed his own hypothetical to Dr. Fisher, which was the same as the ALJ's third hypothetical, except that the individual could only lift up to five pounds and could stand and/or walk only one hour out of an eight-hour workday. (Tr. 288-90.)  Dr. Fisher responded that such an individual could still perform certain sedentary jobs, such as document preparer, surveillance system monitor, and film touch-up inspector. (Tr. 290.)

### 4.  The ALJ's Decision

On March 17, 2005, the ALJ rendered his opinion. (Tr. 14-24.)  He found at step one of the five-step analysis that Terry had not engaged in substantial gainful activity since his alleged onset date, and at step two that he had severe impairments with respect to his ankylosing spondylitis, degenerative disc disease, osteoarthritis of the right hip, and schizoaffective disorder. (Tr. 22.)  However, at step three, he determined that Terry's impairments were not severe enough to meet a listing. (Tr. 22.)  Before proceeding to step four, the ALJ determined that Terry had the following RFC:

> [T]he claimant retains the residual functional capacity to perform less than the full range of light work.  He can lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for at least two hours in an eight-hour workday, and sit for about six hours.  He is limited in pushing and pulling with the lower

15

extremities, meaning no repetitive or frequent operation of foot controls.  He
cannot crouch or climb ladders, ropes or scaffolds.  He must avoid concentrated
exposure to extreme cold, extreme heat, wetness, fumes, odors, dusts, gases and
poor ventilation.  He cannot work around unprotected heights.  He also is limited
to simple, routine, repetitive tasks, with no production rate pace, but rather goal-
oriented work.  He can be around other employees throughout the workday, but
only have occasional conversations and interpersonal interaction with them.

(Tr. 20.)  Based on this RFC, the ALJ concluded at step four that Terry could not perform his

past relevant work and that he had no transferable skills. (Tr. 20-21.)  The ALJ proceeded to step

five where he determined that, considering his age, educational background, and work

experience, Terry could perform a significant range of work available in the national economy,

including wire worker, machine tender, tube assembler, electronics, sub assembler, and mail

sorter. (Tr. 23.)  Therefore, Terry's claim for DIB was denied. (Tr. 22-24.)

### B.  **The Analysis**

#### 1.  *The ALJ Did Not Commit a Legal Error Necessitating a Remand*
#### *When Evaluating the Opinion of Dr. Patel, Terry's Treating Family Practitioner*

First, Terry argues that the ALJ committed an error of law by improperly evaluating the

opinion of Dr. Patel, Terry's treating family practitioner.  More specifically, Terry contends that

the ALJ "confused how the determination of controlling weight and how the determination of

greatest weight is made," and as a result "failed to make a determination of whether Dr. Patel's

opinion is controlling." (Opening Br. at 12-13.)  As will be discussed herein, Terry's argument

comes up short, as a remand on this basis is not warranted.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a

treating physician because of his greater familiarity with the claimant's conditions and

circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this

principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a

16

medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, or in the event of conflicting medical opinions, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).  The Commissioner must always give good reasons for the weight ultimately applied to a treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

Here, in discounting Dr. Patel's opinion, the ALJ explained his reasoning as follows:

> The treating source opinion from Dr. Patel limits the claimant to less than the full range of sedentary work. . . . As the claimant's primary care physician, Dr. Patel has had an ongoing relationship with the claimant, but he is not an orthopaedic specialist and has not been the claimant's primary treater for his orthopaedic problems since the claimant began to see Dr. Arata in July 2003.  In addition, the undersigned does not find evidence in the record to support such extreme limitations, except the claimant's report of symptoms, which was discounted above.  Thus, the Administrative Law Judge does not give controlling weight to Dr. Patel's opinion.

(Tr. 19.)  Indeed, Terry is correct in his assertion that the ALJ's analysis was not articulated in the precise manner set forth under 20 C.F.R. § 404.1527.

However, despite the ALJ's imprecise articulation, his underlying path of reasoning can still be easily traced. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that an ALJ must sufficiently articulate his assessment of the evidence to assure that the important evidence has been considered and that his path of reasoning can be traced).  By stating that he "could not find evidence in the record to support such extreme limitations, except the claimant's report of symptoms," the ALJ obviously had concluded that Dr. Patel's opinion of Terry's limitations was not entitled to controlling weight because he considered it not well-supported by medically acceptable clinical and laboratory diagnostic techniques.[6] *See* 20 C.F.R. § 404.1527; SSR 96-2p.

Once the ALJ determined that Dr. Patel's opinion was not entitled to controlling weight because it was not well-supported, he was required to analyze the factors set forth in 20 C.F.R. §

---

[6] Here, Terry solely argues in his opening brief that the ALJ committed legal error by "confus[ing] how the determination of controlling weight and how the determination of greatest weight is made," never arguing that the ALJ's decision to discount Dr. Patel's opinion was not supported by substantial evidence. (Opening Br. at 12.)  Thus, any attempt by Terry to assert this argument through his reply brief is deemed waived. *Damato v. Sullivan*, 945 F.2d 982, 988 n.5 (7th Cir. 1991) (emphasizing that "arguments that are raised for the first time in a reply brief are waived").

Moreover, even if Terry had timely asserted this argument, the ALJ's conclusion that Dr. Patel's opinion did not merit controlling weight is supported by substantial evidence.  Dr. Patel merely identifies the following clinical findings in his Medical Source Opinion:  that in forward bending Terry lacks touching his fingers to the floor by six to eight inches; that he has "limited motion" in his right hip; that his neuromuscular exam is intact; that he has ankylosing spondylitis of the spine and osteoarthritis of the right hip; and that he is under the care of Dr. Arata and Dr. Stensland. (Tr. 260-62.)  Thus, in light of Dr. Arata's progress notes in September and December 2003, which stated that Terry's right hip was "not all that symptomatic" and that his back problem had largely subsided, it was reasonable for the ALJ to conclude that the extreme limitations assigned by Dr. Patel were not well-supported by medically acceptable clinical and laboratory diagnostic techniques, but were rather a reflection of Terry's subjective limitations.  Perhaps most telling is the following statement made by Dr. Patel at the conclusion of his opinion: "[Terry] *states that* he is unable to work - permanently." (Tr. 262 (emphasis added).) *See generally Dixon*, 270 F.3d at 1177 ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."); *Smith v. Apfel*, 231 F.3d 433 (7th Cir. 2000) (articulating that a treating physician may be biased in favor of his patient and lack an appreciation of how one case compares with other related cases); *Clifford*, 227 F.3d at 870 (emphasizing that a claimant is not entitled to DIB simply because the treating physician states he is unable to work); *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to determine which doctor to believe – the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases – subject only to the requirement that the ALJ's decision be supported by substantial evidence.").

404.1527 to determine the proper weight to apply to the opinion.  It is clear from the record that the ALJ adequately did so.  He articulated that Dr. Patel was not a specialist and that he was not the primary treater of Terry's orthopaedic problems.  Earlier in the opinion, he noted the frequency and nature of Terry's visits to Dr. Patel, commenting that in 2003 and 2004 Dr. Patel saw Terry several times for leg and hip pain, but other times for colds and upper respiratory problems. (Tr. 16.)  Accordingly, the ALJ chose to discount Dr. Patel's Medical Source Opinion, which assigned Terry "extreme limitations" and effectively restricted him to less than the full range of sedentary work. (Tr. 19.)

Thus, the ALJ's articulation of the controlling weight analysis with the weighing of the factors required by 20 C.F.R. § 404.1527 is harmless error not constituting grounds for a remand, as the ALJ's path of reasoning can be easily traced and any more precise articulation by the ALJ would not have changed his ultimate determination. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).

### 2. *The ALJ Did Not Err When Evaluating the Opinion of Dr. Murphy, Terry's Treating Psychiatrist*

Terry also contends that the ALJ erred when evaluating the opinion of Dr. Murphy, his treating psychiatrist, by "failing to explain the weight given the opinion" and by "failing to explain why evidence contradictory to [Dr. Murphy's] opinion was rejected." (Opening Br. at 14.)  Terry's arguments, both ultimately unsuccessful, will each be discussed in turn.

As to his first argument, Terry more specifically asserts that the ALJ erred by "fail[ing] to explain why he does not give full weight [to Dr. Murphy's] opinion except to say that the limitations are not supported by the record." (Opening Br. at 13.)  However, in contrast to

19

Terry's contention, quite the opposite is true, as the ALJ provided an adequate rationale for why he chose not to assign controlling weight to Dr. Murphy's opinion.

Here, the ALJ considered that Terry had a ten-year history of a schizoaffective disorder, that he saw Dr. Murphy generally once every six months, and that Dr. Murphy's progress notes indicated that Terry's condition was stable much of the time with medication, with the exception of two anxiety attacks in 2003.[7] (Tr. 18-19.)  The ALJ further noted that Terry *himself* acknowledged that his schizoaffective disorder had been stable a long time and that he filed for DIB based on physical reasons only, even declining to undergo a consultative psychological examination offered during the DIB application process. (Tr. 19-20, 91-92.)  The ALJ specifically observed that there was no evidence in the record to support Dr. Murphy's opinion that Terry had marked limitations in the ability to handle pressure and changes at work; moderate limitations in the ability to understand, remember, and carry out simple instructions; and moderate limitations in the ability to interact appropriately with supervisors, co-workers, and the public.[8] (Tr. 18.)  Rather, the ALJ surmised that Terry seemed to be "suffering very little functional limitation at the time of the alleged onset of disability." (Tr. 19.)

After considering this evidence, the ALJ concluded that Dr. Murphy's opinion should be

---

[7] The ALJ specifically considered the following comments from Dr. Murphy's progress notes: on January 23, 2002, that Terry was noted to be pleasant; on July 19, 2002, that he had a wide range of affect; on January 18, 2003, that he was pleasant and brighter; on July 18, 2003, that Dr. Murphy prescribed Ativan; on September 30, 2003, that his mood was good, with no irritability or depression; on March 30, 2004, that he had occasional anxiety; on July 8, 2003, that his mood was not very good, but medications would not be changed; and on September 14, 2004, that his disorder was exacerbated by his multiple medical problems and because he had been off his medications. (Tr. 18.)

[8] In fact, the record suggests quite the opposite, as Terry stated in his DIB application and at the hearing that he has no difficulty getting along with others. (Tr. 80, 277.)  Likewise, Terry's father also reported that Terry has no problems getting along with people (including authority figures) and that Terry's ability to handle stress and changes in routine was "good." (Tr. 86-88.)

assigned "greater weight," (Tr. 20), but not controlling weight, because of the significant

inconsistencies noted between Dr. Murphy's Medical Source Opinion and the rest of the record,

including the opinion of the state agency psychologists who assessed that Terry had only mild

limitations arising from his schizoaffective disorder.  As a result, the ALJ limited Terry in his

RFC to "simple, routine, repetitive tasks, with no production rate pace, but rather goal-oriented

work" and restricted his interaction with other employees to "occasional conversations and

interpersonal interaction." (Tr. 22-23.)

Clearly, Terry's first argument falls short, as the ALJ adequately articulated his reasoning

for the weight he ultimately assigned to Dr. Murphy's opinion. *See Skarbek v. Barnhart*, 390

F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion if it

is inconsistent with the opinion of a consulting physician, or when the treating physician's

opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or

rejecting evidence of disability.") (internal citations and quotation marks omitted).

Terry's second argument – that the ALJ erred by "failing to explain why evidence

contradictory to his opinion was rejected" – also comes up short. (Opening Br. at 13-14.)  Here,

Terry first asserts that the ALJ failed to consider his testimony that he had difficulty

concentrating on the job because he "hear[s] voices and [has] hallucinations" and that he "get[s]

real nervous," making it difficult to keep up with production. (Tr. 277.)  However, as will be

discussed *infra*, the ALJ concluded that Terry's testimony was not fully credible, adequately

explaining why he discounted this evidence.

Terry also asserts that the ALJ failed to explain why he rejected the evidence of his two

panic attacks.  However, contrary to Terry's assertion, the ALJ did indeed specifically consider

that he had two panic attacks in February and July 2003, (Tr. 18); however, he *also* considered

that Terry's ten-year history of schizoaffective disorder was primarily stable, that Terry asserted

in September 2003 that his physical limitations were his sole reason for applying for DIB and

refused to undergo a consultative psychological examination, and that the state agency

psychologists who reviewed Terry's record after the two panic attacks occurred concluded that

he had only mild limitations arising from his schizoaffective disorder. (Tr. 19-20.)

Finally, Terry asserts that the ALJ failed to explain why he discarded the evidence

contained in Dr. Murphy's progress note dated September 14, 2004 – that Terry presented as

disheveled, unshaven, and with slurring speech, stating that he had not slept in a week. (Tr. 267.)

However, contrary to Terry's argument, the ALJ did specifically consider Dr. Murphy's progress

note dated September 14, 2004, noting that Dr. Murphy *also* reported in that same note that

Terry had been off of his medications at the time. (Tr. 18.)

Here, the ALJ appropriately considered the evidence that Terry points to and adequately

explained his reasons for deciding inapposite to such evidence. *See generally Smith*, 231 F.3d at

440 (finding that the ALJ "took into account the relevant criteria in determining the weight to

give [the treating physician's] opinion and provided sufficient explanation for his decision");

*Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (stating that "the ALJ's decision must be

based upon consideration of all the relevant evidence and that the ALJ must articulate at some

minimal level his analysis of the evidence") (internal quotation marks omitted).  Thus, the ALJ

did not commit legal error, and his decision to discount Dr. Murphy's opinion was supported by

substantial evidence.

### 3. The ALJ's Credibility Determination Is
### Supported by Substantial Evidence

Terry also contends the ALJ's determination that his testimony regarding his functional limitations was "not fully credible" is not supported by substantial evidence. (Opening Br. at 14-16.)  Terry's argument is ultimately unavailing and, accordingly, the ALJ's credibility determination will not be disturbed.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimal level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek*, 226 F.3d at 811, his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carrandine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ discounted Terry's testimony of debilitating limitations because he found it was not supported by objective medical evidence, Terry's treatment history, and the performance of his daily living activities. (Tr. 19.)  More specifically, the ALJ noted that Dr. Arata concluded Terry's right hip was not very symptomatic and was being treated conservatively, that Terry's left leg pain was to be treated conservatively, that Terry drives and helps perform many household chores, including cleaning floors, and that he takes only a non-prescription pain reliever. (Tr. 19.)

23

First, while he acknowledges that his right hip was not very symptomatic, Terry asserts that the ALJ failed to consider that his ankylosing spondylitis *also* supports his allegations of debilitating pain. (Opening Br. at 14.)  However, as the ALJ noted, Terry, who was taking only a non-prescription pain reliever on an as-needed basis at the time, told Dr. Arata on December 1, 2003, that he could "live with" his current back problem, and Dr. Arata recommended that Terry's back problem should be managed non-surgically. (Tr. 256.)  Accordingly, the ALJ took note of the inconsistency between Terry's report to Dr. Arata and his testimony at the hearing of debilitating pain.

Next, Terry tangentially argues that, while the "treatment was to be conservative for the right hip and non-surgical for his leg pain, this treatment was not for his ankylosing spondylitis." (Opening Br. at 15.)  Terry then proceeds to describe the general treatment (drugs, proper posture, and daily exercise) for ankylosing spondylitis from a medical text. (Opening Br. at 15.) However, Terry fails to specifically explain what treatment he received for ankylosing spondylitis that the ALJ failed to consider and how it would have impacted his credibility determination.

Terry does ultimately arrive at one ascertainable argument about his treatment history – that the ALJ should not have pointed to Terry's use of a non-prescription pain reliever in his credibility analysis without further inquiry of Terry's rationale for using them. (Opening Br. at 15.)  While indeed the ALJ should have inquired further of Terry's reason for using only a non-prescription pain reliever, *see* SSR 96-7p, his failure to do so here is not fatal in light of the other substantial evidence supporting his credibility determination.

Furthermore, the ALJ was entitled to consider Terry's method of pain relief as a factor in

24

evaluating his complaints of pain. *See* 20 C.F.R. § 404.1529.  Moreover, Terry, who was

represented by counsel at the hearing, did not provide any information that would suggest his use

of a non-prescription pain reliever was ineffective in controlling his pain. (*See* Tr. 275, 279

(explaining that after walking around the block, he takes two 500 milligrams of Tylenol for pain

relief); Tr. 276 (stating that the pain in his hip is relieved if he sits a different way or takes

Tylenol); Tr. 277 (reporting that he takes prescription medication for his schizoaffective disorder

and blood pressure, but "Tylenol for the pain"); Tr. 279, 282 (explaining that after performing

housework that involves lifting, he takes Tylenol for pain relief)).  Thus, the ALJ reasonably

inferred that Terry's pain was of the level that was adequately controlled by a non-prescription

pain reliever. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (stating that an ALJ

is entitled to make reasonable inferences from the evidence of record).  Accordingly, Terry's

second argument – that the ALJ failed to adequately take into account his treatment history with

respect to his ankylosing spondylitis – is unavailing.

Third, Terry alleges that the ALJ's evaluation of his daily living activities "is superficial

and does not consider all of the evidence," and thus was not a proper basis upon which to

discount his testimony. (Opening Br. at 15.)  However, Terry's argument is again unpersuasive.

The ALJ "need not provide a complete written evaluation of every piece of testimony and

evidence," *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995), but rather must sufficiently

articulate his assessment of the evidence to assure that the important evidence was considered

and that his path of reasoning can be traced. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.

1993).  Here, in evaluating Terry's complaints of pain, the ALJ considered that Terry drives and

helps with many household tasks, including cleaning floors. (Tr. 19.)  The ALJ is entitled to

consider this evidence as a factor in evaluating the credibility of his complaints of debilitating pain. *See* 20 C.F.R. § 404.1529 (stating that a claimant's daily activities will be considered in evaluating his symptoms); *see generally Smith*, 231 F.3d at 440 (finding that the claimant's pain complaints were "inconsistent with his minimal, non-prescription treatment (6 non-aspirin a day), his ability to perform his daily activities without much difficulty, and his appearance and demeanor at the hearing").

Finally, Terry alleges that when discounting his testimony, the ALJ failed to consider the combination of limitations arising from his physical impairments, mental status, and obesity. (Opening Br. at 15-16.)  However, again Terry misses the mark.  The RFC assigned by the ALJ *did* take into account his mental status, despite Terry's statement to the Field Examiner that he was applying for DIB based on physical reasons only and that he refused to undergo a consultative psychological examination.  Likewise, the RFC also considered his physical impairments by including restrictions in sitting, walking, lifting, crouching, climbing, lifting, pushing, and pulling.

Nonetheless, Terry points to three spots in the record where his height and weight are recorded, (Tr. 113, 183, 202), in a lame attempt to argue that the ALJ should have deduced that he was obese. (Opening Br. at 15.)  However, Terry, who was represented by counsel at the hearing, *see Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) (articulating that when a claimant is represented by counsel an ALJ "is entitled to assume that the applicant is making his strongest case for benefits"), never alleged obesity as a basis for disability and, more importantly, has not pointed to *a single piece of evidence* in the record that noted Terry had a weight problem, referred to him as obese, or stated that he should lose weight.

26

*Contra Clifford*, 227 F.3d at 873 (stating that the ALJ should have considered the claimant's obesity even though she did not allege it as a basis of disability where there were numerous references in the record to the claimant's "excessive" weight problem, including a statement from a medical professional that she was "obese," a suggestion by another medical professional that she lose weight, and that her physician prescribed a diet). Clearly, Terry's assertion that the ALJ erred by failing to consider his alleged obesity falls short.

In summary, the ALJ's credibility determination will be upheld, as the ALJ has sufficiently articulated his reasoning in arriving at the determination, and it is not "patently wrong." *See generally Carrandine*, 360 F.3d at 754 ("In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it.").

    *4.  The ALJ Did Not Commit a Legal Error Necessitating a Remand at Step Five*

Finally, Terry argues that the ALJ erred at step five by posing hypotheticals to Dr. Fisher, the vocational expert, which were inconsistent with the actual RFC assigned to him by the ALJ. (Opening Br. at 16-17.) Specifically, Terry contends that the ALJ failed to include that Terry could "stand and/or walk for at least two hours in an eight-hour workday" when posing his hypotheticals, explaining that this "inconsistency is material because the actual RFC found by the ALJ [would] substantially reduce the number of jobs in which [the ALJ's] Step 5 finding was based." (Opening Br. at 17.)

At the hearing, the ALJ posed to Dr. Fisher a series of three hypotheticals, each depicting a hypothetical individual with various limitations progressing in severity. The first two hypotheticals encompassed all of the limitations ultimately articulated in Terry's RFC, with the

exception of his two-hour standing/walking limitation.  In the third hypothetical, however, the ALJ asked Dr. Fisher to consider an individual with all of the limitations posed in the first hypothetical, who was *also* limited to sedentary work.  Sedentary work, by definition, does not require walking or standing more than two hours in an eight-hour workday. *See* SSR 83-10 (explaining that sedentary work involves periods of standing or walking generally no more than about two hours out of an eight-hour workday); *see also* 20 C.F.R. § 404.1567(a); *Marlow v. Barnhart*, No. 04 C 7780, 2005 WL2562652, at *18 n.29 (N.D. Ill. Oct. 13, 2005); *York v. Massanari*, 155 F. Supp. 2d 973, 983-84 (N.D. Ill. 2001).  Thus, the ALJ's third hypothetical adequately incorporated Terry's two-hour standing/walking limitation.

Nonetheless, Terry contends that the ALJ further erred at step five by improperly incorporating into his analysis the light work jobs responsive to his first two hypotheticals.  As Terry's argument goes, while the ALJ concluded that the 2,725 to 3,025 available jobs was a "significant number" under the Act, he might not have reached this same conclusion if he had properly excluded the light work jobs responsive to his first two hypotheticals and considered solely the 900 to 1,100 available sedentary jobs responsive to his third hypothetical. *See generally* 42 U.S.C. § 423(d)(2)(A).

In contrast to Terry's assertion, however, the ALJ's error in including these light work jobs in his analysis at step five is ultimately harmless. *See Shramek*, 226 F.3d at 814.  In the body of his opinion, the ALJ clearly identified 900 to 1,100 available sedentary jobs; under Seventh Circuit case law, this quantity constitutes a "significant number" adequate to satisfy the Act's requirements. *See Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ind. 1990) (finding that 675 available jobs was a significant number), *aff'd* 936 F.2d 575 (Table) (7th Cir. 1991); *see also Lee*

*v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (holding that 1,400 jobs was a significant number,

citing cases from other circuits that held from 175 jobs to 1,350 jobs was a significant number);

*Humphries v. Apfel*, No. 99 C 1200, 2000 WL 204234, at *11 (N.D. Ill. Feb. 11, 2000) (finding

that 1,000 jobs was a significant number).  Thus, the ALJ's inclusion of the light work jobs in his

analysis at step five constituted harmless error and does not serve as a basis for a remand.[9] *See*

*Shramek*, 226 F.3d at 814.

## VI.  CONCLUSION

As discussed herein, the ALJ did not commit legal error necessitating a remand when

evaluating the opinion of Dr. Patel, Terry's treating family practitioner, and Dr. Murphy, Terry's

treating psychiatrist.  Likewise, the ALJ's determination that Terry's testimony of debilitating

pain was "not fully credible" is supported by substantial evidence.  Finally, the hypotheticals

posed at step five by the ALJ to the vocational expert do not provide grounds for a remand, as

the ALJ's third hypothetical adequately encompassed Terry's limitations.

Accordingly, for the reasons set forth herein, the decision of the Commissioner is

---

[9] In his reply brief, Terry asserts for the first time that the ALJ also committed legal error by (1) listing solely light work jobs in the findings section of his opinion and (2) failing to comply with SSR 96-9p by omitting from Terry's RFC the frequency of his need to alternate sitting and standing. (Reply Br. at 6.)  However, as discussed *supra*, arguments raised for the first time in a reply brief are deemed waived. *See Damato*, 945 F.2d at 988 n.5.

In any event, even if Terry had properly raised the arguments in his opening brief, they would still be unsuccessful. As to the first argument, the ALJ adequately articulated in the body of his opinion the existence of 900 to 1,100 available sedentary jobs (Tr. 21-22); the identification of solely light work jobs in the findings section of his opinion constitutes harmless error. *See Skarbek*, 390 F.3d at 504 (declining to remand a case where the ALJ's error would not change the case's ultimate outcome).  As to his second argument, the ALJ did not limit Terry to solely sedentary jobs; rather, his RFC stated that he could "perform less than the full range of light work." (Tr. 22.) Therefore, Terry's argument that the ALJ failed to comply with SSR 96-9p, a ruling pertaining to claimants limited to less than a full range of sedentary work, is inapplicable here.

AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Terry.  SO ORDERED.

Enter for this 3rd day of May, 2006.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge